PULLMAN'S PALACE-CAR CO. v. AMERICAN LOAN & TRUST CO. et al.

(Circuit Court of Appeals, Eighth Circuit. December 6, 1897.)

No. 912.

RAILROAD RECEIVERSHIPS—PREFERRED CLAIMS—PULLMAN PALACE-CAR RENTALS.

Mileage due under a contract for the use of Pullman palace cars is not distinguishable from car rentals, and cannot be made a preferred claim on the appointment of a receiver for the railroad company. Thomas v. Car Co., 13 Sup. Ct. 824, 149 U. S. 95, applied.

Appeal from the Circuit Court of the United States for the District of Colorado.

This was an intervening petition filed by Pullman's Palace-Car Company in the foreclosure proceedings against the Union Pacific, Denver & Gulf Railway Company, praying that Frank Trumbull, receiver of the said railway company, be ordered to pay a claim for $21,505.90, with interest, held by the petitioner against the railway company. The receiver demurred to the petition, and the demurrer was sustained, and the petition dismissed.

The petitioner's claim was for car mileage arising under a contract which, as set forth in the petition, provided, among other things, that the petitioner should have the exclusive right, for a term of 15 years from the date of the contract, to furnish sleeping and parlor cars for the use of the said railroad companies, and all their passenger trains, over their entire lines of road, and over all railroads controlled by them. That the petitioner should remain the owner of said cars, and should retain the right to collect fares for the use of seats and berths therein; should furnish one or more employés for each car; should renew and improve certain portions thereof, as provided in said contract, and as might be necessary to keep the said cars up to the average standard of the best cars of that character in use on railroads of the United States; and should do certain other things with reference to the maintenance and management of the said cars. That, in consideration thereof, the said railroad companies agreed, among other things, that they would furnish to and for said cars certain material and supplies as provided in said contract; that they would pay to the petitioner the cost of repairing and making good all damages to said cars arising from accidents or casualties on the lines of said railroad companies; would promptly make all repairs that might be necessary to put said cars in good order; would furnish, free of charge, at convenient points, necessary space and facilities for storing bedding and other supplies; and

would pay to the petitioner, as the cost of maintaining the running gear and bodies of said cars, the sum of three cents per mile for every mile run by said cars upon the lines of the said roads, or upon the roads of other companies by direction of the officers of said railroad companies. The petition further alleged that the said cars yielded to the Union Pacific, Denver & Gulf Railway Company from September 30, 1890, to July 30, 1893, a large amount of revenue, no part of which has been paid to the petitioner, as in equity and in accordance with the terms of said contract should be done, but that the same was wrongfully diverted and paid as interest to the holders of the mortgage bonds of said company, and used to improve and benefit the corpus of the property of said company; that said cars are, and at all times have been, necessary for the proper operation of passenger trains over the road of the Union Pacific, Denver & Gulf Railway Company, and over the roads controlled by the said receiver, and that said trains could not, at any time, have been, and could not now be, successfully or profitably operated, nor could the demands of the traveling public thereon be met, without the use of said cars; that at all times during said period, from September 30, 1890, to June 30, 1893, there were divers lines of railroads competing with the said the Union Pacific, Denver & Gulf Railway Company, and that each and all of said competing lines were fully equipped and provided with sleeping and parlor cars, and that if the roads of the said Union Pacific, Denver & Gulf Railway Company had not been provided with said cars it would have suffered great loss and damage in its passenger travel by reason of the diversion of such travel to such competing lines, and that thereby the gross and net earnings of said road would have been greatly diminished, and the bondholders of said company would have suffered great loss; that the said sleeping and parlor cars are protected by patents of the United States owned by the petitioner, and that it has exclusive control of said cars, and that during the said period from September 30, 1890, to June 30, 1893, no other sleeping or parlor cars than those owned by the petitioner were in use or operated within the territory traversed by the Union Pacific, Denver & Gulf Railway Company by any of the lines connecting or competing with the road of said company; and that if the petitioner had elected to exercise its right to terminate said contract, as it well might have done under the terms thereof, because of the failure of the Union Pacific, Denver & Gulf Railway Company to pay the amount due on account of the use of said cars, it would have been impracticable for said company to have procured other suitable sleeping and parlor cars for use upon said road, or to have made any contract with any individual or corporation, owning or operating sleeping or parlor cars, for the use of such cars upon said road; and that if the petitioner had elected during said period from September 30, 1890, to June 30, 1893, to terminate said contract, such action would not only have caused great inconvenience and discomfort to the traveling public, but would also have seriously diminished the earning capacity of the road and of the trust estate, and would thereby have caused great loss and damage to all persons interested therein, and particularly to the mortgage bondholders of the Union Pacific, Denver & Gulf Railway Company.

## Brief for Appellant.

Expenses necessarily incurred in the operation of the road and conserving the property, and in providing the road with necessary services, supplies, and equipment during a reasonable time prior to the appointment of the receiver, are preferred claims. Farmers' Loan & Trust Co. v. Kansas City, W. & N. W. R. Co., 53 Fed. 182; Finance Co. of Pennsylvania v. Charleston, C. & C. R. Co., 10 C. C. A. 323, 62 Fed. 205; Newgass v. Railway Co., 72 Fed. 712; Railroad Co. v. Lamont, 16 C. C. A. 364, 69 Fed. 23; Trust Co. v. Morrison, 125 U. S. 591, 8 Sup. Ct. 1004; Blair v. Railroad Co., 22 Fed. 471; Miltenberger v. Railroad Co., 106 U. S. 286, 1 Sup. Ct. 140; Union Trust Co. v. Illinois M. Ry. Co., 117 U. S. 434-457, 6 Sup. Ct. 809; Central Trust Co. v. St. Louis, A. & T. Ry. Co., 41 Fed. 551-554; Trust Co. v. Souther, 107 U. S. 591, 2 Sup. Ct. 295; Kneeland v. Machine Works, 140 U. S. 592, 11 Sup. Ct. 857; Burnham v. Bowen, 111 U. S. 776, 4 Sup. Ct. 675; Railroad Co. v. Humphreys, 145 U. S. 82, 12 Sup. Ct. 787; Fosdick v. Schall, 99 U. S. 235.

Indebtedness for car rentals may or may not be entitled to a preference,

according to the special circumstances of the particular case. It is no exception, however, to the general rule (a) that expenses necessarily incurred in the proper operation of the road, or in enabling it to perform its obligations to the public, are entitled to be paid prior to the mortgage lien; (b) that where current receipts have been diverted from the payment of current expenses, and any one class of creditors has been given that which in equity should have been given to another, a court of equity will, as far as practicable, restore the parties to their original equitable rights; (c) and that, when it is to the interest of the trust estate that the contract entered into by the railroad company be carried out, the court will direct the receiver to perform it; and (d) that, where such an indebtedness has been incurred, it is to be regarded as a preferred claim, whether incurred from the use of cars or otherwise.

There is no decision, or dictum even, making car rentals an exception to this general rule. To sustain the proposition that "car rentals due from a railroad company, like those due petitioner, are not looked upon as a claim having preferential rights, and are not entitled to priority out of the earnings during the receivership, or out of the corpus of the estate," counsel for the receiver cite Thomas v. Car Co., 149 U. S. 95, 13 Sup. Ct. 824; Kneeland v. Trust Co., 136 U. S. 89, 10 Sup. Ct. 950; Transportation Co. v. Anderson, 22 C. C. A. 109, 76 Fed. 164; Bound v. Railway Co., 7 C. C. A. 322, 58 Fed. 478.

The petitioner's claim possesses all the equitable features which are held as requisite to entitle it to be preferred over the mortgage debt. The petition alleges that the use of the cars was indispensable to the successful and profitable operation of the road, and that without them the road could not properly have performed its duties to the public; that a large amount of revenue was earned by these cars, and that without them this income would have been diverted to other and competing lines; that the income thus earned has been inequitably, and in violation of the terms of the contract, diverted to the payment of interest to the bondholders and to the improvement and benefit of the corpus of the property; that the petitioner had the exclusive control of parlor and sleeping cars in the territory traversed by the road, and that it would have been impracticable for the road to obtain other suitable cars elsewhere; and that it is to the advantage of the trust that this contract be carried out, for if the petitioner should now elect to terminate the contract for nonpayment of arrears, "as it might well do under the provisions of the contract," the road and the mortgagees would suffer great loss and the public great inconvenience.

Upon the point urged by counsel, that the benefit to the security derived from the use of the petitioner's cars is too remote and indirect to be a basis for preference, it is sufficient to say that a direct and proximate benefit is alleged in the petition, namely, the amount of railroad fares paid by the Pullman passengers who would otherwise have traveled upon competing lines; and it must be presumed, upon demurrer, that this averment can be established by evidence. The petition avers that the receiver is still using the cars upon the terms agreed upon in the contract. The presumption would therefore be that the value of the use of these cars to the trust estate is three cents per mile, the amount agreed upon in the original contract, and now being paid by the receiver. The benefit derived from the use of the Pullman cars is certainly not as problematical as the benefit that the security derives from the services of unskilled laborers, and yet indebtedness due laborers is everywhere conceded to be entitled to preference. The petitioner should, at any rate, be allowed to show in evidence, if it can, the benefit to the security derived from the use of its cars.

While the allowance of the claim is, in a measure, a matter within the discretion of the court, and to be determined by the equities of the case, yet where, from the current receipts, interest has been paid to the bondholders and permanent improvements have been made,—or, in other words, where there has been a diversion of the income,—then the debts incurred, within a reasonable time, in the operation of the road, are entitled to priority out of the earnings of the receivership, and, when necessary, even out of the corpus of the estate. Fosdick v. Schall, supra; Finance Co. of Pennsylvania v. Charleston, C. & C. R. Co., supra; High, Rec. § 394c; and cases supra.

It is not, however, indispensable that there should be a diversion of the income; that is simply an item for equitable consideration, and makes the equity stronger. Farmers' Loan & Trust Co. v. Kansas City, W. & N. W. R. Co., supra; Finance Co. of Pennsylvania v. Charleston, C. & C. R. Co., supra, Union Trust Co. v. Illinois M. Ry. Co., supra.

It is not necessary that the provision for the payment of debts of the road be made at the time of the appointment of receiver, nor that the consent of bondholders be obtained.    An order directing that a claim be preferred may be made at any time.  Union Trust Co. v. Illinois M. Ry. Co., supra; Farmers' Loan & Trust Co. v. Kansas City, W. & N. W. R. Co., supra.

There is no rule barring preferential debts contracted more than six months, or at any specific time, before the appointment of the receiver. Farmers' Loan & Trust Co. v. Kansas City, W. & N. W. R. Co., supra; Hale v. Frost, 99 U. S. 389; Burnham v. Bowen, supra; Atkins v. Railroad Co., 3 Hughes, 307, Fed. Cas. No. 604; Railroad Co. v. Lamont, supra; Trust Co. v. Morrison, supra.

### Appellant's Supplemental Brief.

Appellant's claim is, strictly speaking, not one for car rental.  It is more properly a claim for services rendered by the appellant in maintaining and preserving the coach feature of these cars, i. e. such parts of the cars as are common or incidental to ordinary first-class passenger cars, and not essential and peculiar to sleeping or parlor cars.  The contract provides that the appellant, remaining the owner of the cars and providing sufficient employés to insure the comfort of the passengers, "shall keep all such sleeping and parlor cars in good order and repair, and shall renew and improve the same, so far as may be necessary to keep them up to the average standard of the best sleeping and parlor cars generally in use on the lines of the trunk-line railroad companies in the United States."  Contract, art. 1, § 4.

There are practically two features of a sleeping car which are contemplated by the contract, and which must be preserved in order to insure its safety and comfort, and these are:  (1) The coach feature, so called, or those parts of the car which are common and incidental to all first-class passenger cars, such as the running gear and body of the car; and (2) the sleeping-car feature, or those parts of the car which are peculiar to, and characteristic of, sleeping cars, such as the beds, linen, etc.  The second or sleeping-car feature is maintained absolutely by the Pullman Company, without any compensation therefor being paid by the railroad company; i. e. the Pullman Company must supply its own mattresses, bedding, linen, and all other features of the car which essentially distinguish it from an ordinary first-class passenger car.   But the cost of maintaining the coach feature of the car is borne by the railroad company; that is to say, the railroad company, under the contract, has agreed to defray the cost and expense of maintaining the running gear and bodies of the cars, "and such other parts thereof as are incidental to ordinary first-class passenger cars, and are not essential to the sleeping or parlor car."  It was agreed by the parties to the contract that this particular work could be done more effectively and economically by the Pullman Company; and therefore the contract provides (article 1, § 4) that the latter company should keep all these cars in good order and repair, as above stated.   It was necessary that the cars should be kept in good repair, and it was also necessary that the railroad company should employ some one to do that work.  It cannot affect the legal aspect of this question whether the railroad company paid for such services by the day, or for the specific amount of work performed, or by the number of miles run by such cars, or in any other particular manner.  The parties to this contract agreed that the railroad company should discharge this obligation on the basis of the number of miles run, and engaged the Pullman Company to make these repairs.  Nor is the legal and equitable aspect of this agreement affected by the fact that the cars are owned by the Pullman Company, and not by the railroad company.  Whoever owned the cars, whether the railroad company or the Pullman company, their use was indispensable to the proper operation of the road, and the cost and expense of maintaining them and keeping them in repair were necessary operating expenses.

And, in order that this portion of the contract might be the more effectually performed, it provides (Contract, art. 2, § 1): "That the railroad company shall also, in consideration of the use of such sleeping and parlor cars for the transportation of its passengers, bear the cost of maintaining the running gear and bodies of such cars, and such other parts thereof as are incidental to ordinary first-class passenger cars, and not essential to a sleeping or parlor car, which cost is understood and agreed to amount to an average of three cents per mile; and shall pay to the Pullman Company, in fulfillment of such obligation, the said sum of three cents per car per mile for every mile run by such sleeping and parlor cars upon the roads of the railroad company, or upon the roads of other railroad companies by direction of the officers of the railroad company."

Necessarily, the cost of such maintenance and repairs was an uncertain and variable element; and in order to liquidate the same, and reduce to certainty and precision the amount to be allowed the Pullman Company for this work, it was agreed that the cost of such maintenance and repairs should be *regarded as amounting to an average of three cents per mile.*

This allowance of three cents per mile was not intended to be, and is not made, a source of profit to the Pullman Company. It was simply intended to reimburse the Pullman Company for the outlay and disbursements it was obliged to make in maintaining the coach feature of the cars, in order that they might be operated by the railroad company with safety and comfort to its passengers.

Although not appearing in the record, it is a fact that those railroads which use narrow-gauge cars pay no mileage whatever for the operation of their sleeping cars, for the simple reason that all the work of maintaining and repairing the coach feature of such cars is performed by the railroad companies operating them.

Under this contract the advantage derived, and consideration received, by the railroad company, are the inducements offered to the traveling public of safe and comfortable sleeping and parlor cars, and the consequent sale of a larger number of passenger tickets; and also, by the operation of Pullman cars under this contract, the railroad company is enabled to avoid the necessity of hauling additional passenger cars of its own, thereby saving to the railroad company expenses which would necessarily be incurred if it were obliged to haul such additional cars for the accommodation of its passengers; the consideration to the Pullman Company being the sale of its seats and berths, and the revenue derived therefrom. This mileage of three cents, being simply one of the incidental and unavoidable expenses of the railroad company connected with the operation of its passenger trains, is as necessary and unavoidable as the cost and expense of maintaining and repairing its engines, freight cars, or any other portion of its rolling stock, and is therefore *distinctly an operating expense.*

It is well established, by a long line of decisions, that claims for indebtedness incurred in repairing, maintaining, and keeping in order the roadway, rolling stock, and equipment of the road, necessary for the proper operation of the same, are regarded as operating expenses, and as such are entitled to priority over the payment of the mortgage indebtedness.

In our main brief we have cited the leading authorities upon this subject; and, in addition to them, we submit to the consideration of the court the following authorities: Blair v. Railway Co., 22 Fed. 769; Southern Ry. Co. v. Carnegie Steel Co. (Nov., 1896) 22 C. C. A. 289, 76 Fed. 492. See, also, Southern Ry. Co. v. American Brake Co., 22 C. C. A. 298, 76 Fed. 502; Railway Co. v. Adams, 22 C. C. A. 300, 76 Fed. 504; Railway Co. v. Tillett (Nov., 1896) 22 C. C. A. 303, 76 Fed. 507.

L. M. Cuthbert (Henry T. Rogers and D. B. Ellis, on brief), for appellant.

E. E. Whitted (H. W. Hobson, on brief), for appellees.

Before BREWER, Circuit Justice, and SANBORN and THAYER, Circuit Judges.

PER CURIAM. Notwithstanding the ingenious and able argument of counsel for appellant, we are unable to perceive in this case other than an effort to establish as a preferential debt a claim for the stipulated compensation for the use of cars, or, as it is generally called, "car rental." Under the authority of Thomas v. Car Co., 149 U. S. 95, 13 Sup. Ct. 824, this cannot be done. The order is therefore affirmed.